[Civ. No. 24120. Second Dist., Div. Two. May 27, 1960.]

B. J. NAVARRO, Respondent, v. RAYMOND E. JEFFRIES et al., Defendants; JEFFRIES TRUCK PARTS AND EQUIPMENT, INC. (a Corporation), Appellant.

A. W. Brunton for Appellant.

Edward B. Olsen for Respondent.

RICHARDS, J. pro tem.*—Defendant Jeffries Truck Parts and Equipment, Inc. (hereinafter called "defendant"), ap-

*Assigned by Chairman of Judicial Council.

peals from a judgment of $5,198.36 in favor of plaintiff for the breach of a contract for the machining of truck oil pans.

Early in 1955, certain officials of defendant corporation, a truck parts distributor, conceived the idea of producing in quantity and selling a crank case oil pan for use on a certain type of diesel truck engine. A salable finished pan involved two major operations: (1) a foundry production of raw castings from a special mold; and (2) finish machining and installation of a certain steel insert.

After discussing quantity casting costs with various foundries and quantity machining cost with plaintiff and other machine shops, on May 24, 1955, defendant ordered 500 castings from a foundry to be produced to conform to sample. The same day plaintiff and defendant signed an untitled and undated document, the construction and effect of which is the basis of this litigation. The document was prepared by the plaintiff in the defendant's office and obviously is not the product of a scrivener of legal documents.

The opening paragraph thereof reads as follows: "Received of Jeffries Truck Parts & Equipment, Inc., the sum of $775.00 as payment to be applied on the manufacture of drilling jigs and deposit on machine work. The portion of the aforementioned sum that will be applied toward payment of the machine work will be $500.00, the balance of the sum, or $275.00 will be applied to the cost of the jigs. The $500.00 machine work deposit will apply toward payment of the machining of the last 32 castings of a 500 piece order."

The document then goes on to provide that the $275 will be the total cost of the drilling jigs which will be the property of defendant; that the machine work will be equal to sample, that the machining and part installation charge per casting will not exceed $15.50; that plaintiff will replace improperly machined or damaged castings without cost to defendant; that the machining will be completed by plaintiff within five days after receipt of raw castings provided that the plaintiff has 25 such castings on hand and that the maximum machining production will be limited to 25 castings per day. The final paragraph provides that payment will be due on the first day of each month for work performed the preceding month.

Approximately one month following the execution of the foregoing document, the first raw cast pan was delivered to plaintiff for machining and which raw casting the plaintiff

was obliged to have in order to make the required jigs for machining the pans on a production basis. Plaintiff thereupon acquired certain additional machinery; hired an additional employee; made up the jigs and purchased over 500 steel inserts in anticipation of performing the finished machining on 500 or more pans. During July and August, 1955, the plaintiff received a total of 30 raw castings which he machined conformable to sample, delivered them to the defendant, and for which he was paid at the rate of $15.50 each.

During the latter part of August, 1955, defendant, without advising plaintiff thereof, directed the foundry to cease casting the oil pans and no further raw castings were thereafter delivered to plaintiff for machining. Plaintiff inquired of defendant from time to time when other castings would be delivered to him for machining but was put off with various excuses. It was not until the summer of 1956 that the plaintiff was finally advised by the defendant that there would be no more castings for plaintiff to machine.

In the findings of fact, replete with evidentiary facts and rulings on motions to amend the pleadings, there are findings of ultimate facts that the document referred to is an unconditional order for 500 castings to be machined by plaintiff to conform to sample; that plaintiff received and machined 30 castings in compliance with the contract; that by stopping production of the raw castings, the defendant rendered performance by plaintiff impossible; that plaintiff was ready, willing and able to perform the balance of the contract and that by reason of defendant's prevention of performance the plaintiff was damaged for loss of profits in the sum of $3,753.16, and was damaged in an additional amount of $1,445.20, the depreciation on certain equipment and parts purchased by the plaintiff to perform said contract.

Defendant's principal assignment of error is the admission by the trial court, over defendant's objection, of extrinsic evidence tending to show that the written instrument was a bilateral agreement for the machining by plaintiff of 500 castings to be furnished by the defendant.

Defendant urged in the trial court, as it urges here, that the written instrument was merely an option, entitling defendant to require the plaintiff to machine at $15.50 each, such number of castings as defendant chose to have finished. Plaintiff, on the other hand, urged in the trial court, and

urges here, that the written instrument was bilateral and that the failure of the defendant to furnish 500 castings to be machined by the plaintiff was a breach thereof. Thus, it appears that the parties are in disagreement as to the meaning of the writing which they signed. It is clear from the instrument that the plaintiff made a definite promise to machine 500 castings at $15.50 each. It is likewise clear that defendant agreed to pay $15.50 for each casting machined, but it is not clear whether the sentence reading, "The $500.00 machine work deposit will apply toward payment of the machining of the last 32 castings of a 500 piece order," is a promise to supply 500 castings or only such number as defendants elected to supply. If the agreement related only to one or more castings, why was the deposit made on the machining of the "last 32 castings"? The phrase just quoted indicates a fixed number, 32 of which will be the "last." That fixed number is found in the words "of a 500 piece order." In *Woodbine* v. *Van Horn*, 29 Cal.2d 95 [173 P.2d 17], plaintiff and defendant executed an instrument by which plaintiff sold to defendant all the eucalyptus wood, consisting of 3,000 or more cords, on a particular parcel, at $9.00 per cord, plaintiff to render monthly statements and pay for the wood received. Holding that the plaintiff's promise was ambiguous, the court held that extrinsic evidence was properly admissible to interpret the instrument as binding on the plaintiff to buy all of the wood at $9.00 per cord.

The following established principles are governing: (1) When the language used in a written agreement is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement, but to aid the court in ascertaining the true intent of the parties. Such evidence is received, not to show that the parties meant something other than what they said, but to show what they meant by what they said. (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.*, 46 Cal.2d 517, 524 [297 P.2d 428]; *Barham* v. *Barham*, 33 Cal.2d 416, 422-423 [202 P.2d 289]; *Brookes* v. *Adolph's, Ltd.*, 170 Cal.App.2d 740, 745 [339 P.2d 879].) (2) Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature and subject-matter of the agreement, (*Barham* v. *Bar-*

*ham, supra,* p. 432; *Wachs* v. *Wachs,* 11 Cal.2d 322, 326 [79 P.2d 1085]) and to the conversations between and declarations of the parties during the negotiations at and before the execution of the contract. (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co., supra,* p. 526; *Woodbine* v. *Van Horn, supra,* p. 104; *Brookes* v. *Adolph's, Ltd., supra,* p. 745.)

■ (3) If doubt exists as to whether an agreement is bilateral or unilateral, such doubt should be resolved in favor of the contract as bilateral, thus protecting the rights of both parties. (*Woodbine* v. *Van Horn, supra,* p. 140; *Patty* v. *Berryman,* 95 Cal.App.2d 159, 167 [212 P.2d 937].)

■ (4) When appropriate aids to construction are properly resorted to, an appellate court will accept the interpretation of the contract adopted by the trial court if the extrinsic evidence is conflicting and the determination is supported by the evidence. (*Woodbine* v. *Van Horn, supra,* p. 104; *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 772 [128 P.2d 665]; *Brookes* v. *Adolph's, Ltd., supra,* p. 746.)

No contention is made by defendant that the extrinsic evidence received by the court, if properly admissible, is insufficient to sustain the interpretation placed on the contract by the court. Hence, no lengthy recital thereof is indicated. ■ It is clear from the extrinsic evidence, including defendant's order to the foundry for 500 castings and the defendant's negotiations with the plaintiff prior to the execution of the agreement that the parties intended by what they said in a rather ineptly drawn agreement to enter into a bilateral contract for the machining by plaintiff of 500 castings to be furnished by the defendant at a production rate of $15.50 per casting.

Defendant's only other contention on appeal involves the quantum of damages. As earlier pointed out, the total judgment was $5,198.36 which was made up of $3,753.16 loss of profits and $1,445.20 depreciation on the value of equipment specially purchased by plaintiff in anticipation of performance. The amount of lost profits was arrived at by computing the machining of 500 castings at $15.50, making a total of $7,750, less plaintiff's anticipated wages, overhead and cost of steel inserts, amounting to $3,031.84, leaving a computed loss of profits of $4,718.06, less payments on account of $965, or a net profit loss of $3,753.16. Plaintiff does not urge any error in the method of computing plaintiff's loss of profits.

Plaintiff's second cause of action sought, among other things, the recovery of $2,305.20, the total cost of a planer and drill press specially purchased by the plaintiff for the purpose of performing the contract. The court found that the plaintiff would not have purchased this equipment except in reliance upon the contract; however, instead of awarding plaintiff the cost thereof, the court found that by reason of the defendant's breach of contract, the equipment had depreciated to a value of $1,060, and awarded the plaintiff $1,445.20, not the cost of the equipment, but the difference between the cost and the depreciated value thereof.

Defendant attacks this item of damages on two grounds. First, that the purchase of the equipment was essential to plaintiff's performance and had the contract been fully performed, the plaintiff's net profits would have been reduced by the cost of the equipment, therefore he is not entitled by reason of defendant's breach to such costs. Second, that a judgment for lost profits precludes any further judgment for the costs of making such profits.

The first contention is untenable for the reason that the court did not award plaintiff the whole or any part of the cost of the equipment as an expenditure incurred by plaintiff in preparation of performance, but awarded plaintiff the depreciation thereon as a loss sustained by him in holding the equipment in readiness for performance which was prevented by the defendant. ▮ Even in this regard the general rule is that where, without fault on his part, one party to a contract who is willing to perform is prevented from doing so by the other party, the primary measure of damages is the amount of his loss, which may consist of his reasonable outlay or expenditures toward performance and the anticipated profits which he would have derived from performance. (*Buxbom* v. *Smith,* 23 Cal.2d 535, 541 [145 P.2d 305] ; *James* v. *Herbert,* 149 Cal. App.2d 741, 749 [309 P.2d 91].)

▮ Defendant's second contention, that loss of profits is the sole measure of damages upon a breach consisting of prevention of performance is equally untenable. The measure of damages for defendant's breach of contract is the amount which will compensate plaintiff "for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) ▮ Plaintiff is entitled to all the benefits which he would have obtained if the contract had been performed by both parties. (Civ. Code, § 1512.) One of the benefits

which plaintiff would have received had defendant performed would have been the opportunity to dispose of the specially purchased equipment upon completion of performance. This opportunity was denied to the plaintiff by reason of the delay caused by the defendant until it finally repudiated the contract.

 The primary measure of damages of a contractor upon prevention of performance by a contractee is the amount of the contractor's loss proximately resulting from the breach. (Civ. Code, § 3300; *United States* v. *Behan,* 110 U.S. 338 [28 L.Ed. 168]; *Buxbom* v. *Smith, supra,* p. 541; *James* v. *Herbert, supra,* p. 549.) In addition to loss of profits, losses resulting from enforced idleness are part of the detriment sustained by reason of the breach of contract. (*United States* v. *Behan, supra,* 28 L.Ed. 168, 170; *Cederberg* v. *Robison,* 100 Cal. 93, 97 [34 P. 625].) *Cf. Douglass* v. *Guardian Holding Corp.,* 132 Cal.App. 585 [23 P.2d 80]. "Expenditures caused by contractor's delay of performance would seem to be recoverable either with or without a recovery of lost profits." (17 A.L.R. 2d 1347.) In *Douglass* v. *Guardian Holding Corp., supra* (hearing denied), the court sustained as an item of damages occasioned by defendant's delay in performance, an amount equivalent to the difference between the plaintiff's purchase and subsequent sale price of certain equipment bought in anticipation of defendant's performance. There the plaintiff sold the depreciated equipment, the difference between the cost and the sale price representing the depreciation. Here the plaintiff retained the depreciated equipment and received an award equivalent to the difference between the cost and the sales value, or its depreciation.

*Cederberg* v. *Robison, supra,* page 99: " 'It does not lie in the mouth of the party who has voluntarily and wrongfully put an end to the contract to say that the party injured has not been damaged, at least to the amount of what he has been induced fairly and in good faith to lay out and expend . . . unless he can show that the expenses of the party injured have been extravagant and unnecessary for the purpose of carrying out the contract. . . . The party who voluntarily and wrongfully puts an end to a contract and prevents the other party from performing it is estopped from denying that the injured party has not been damaged to the extent of his actual loss and outlay, fairly incurred.' (*United States* v. *Behan.* 110 U.S. 338 [28 L.Ed. 168])."

We conclude that the award of depreciation as an item of damage in addition to lost profits was proper and the method of arriving at the amount thereof correct.

Judgment affirmed.

Fox, P. J., and Ashburn, J., concurred.